UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:06-00012 |
| | ) | JUDGE ECHOLS |
| BRAD YARBROUGH | ) | |
| | ) | |

## MEMORANDUM

Pending before the Court is Defendant Brad Yarbrough's Motion to Suppress (Docket Entry No. 47) to which the Government responded in opposition (Docket Entry No. 49). The Court held an evidentiary hearing on the Motion to Suppress on February 28, 2007.

## I. FINDINGS OF FACT

Harvey Wayne Martin is a United States Postal Inspector assigned to the Nashville domicile for the last six months. He was previously assigned to the Savannah, Georgia domicile for three and one-half years. Prior to that Inspector Martin served as a certified police officer in the state of Georgia for approximately six years.

On Thursday, October 19, 2006, a postal inspector in San Diego, California, informed Inspector Martin that a parcel addressed to 205 North Patterson Street, Pulaski, Tennessee, had been intercepted and might contain a controlled substance. Inspector Martin received the package for follow-up investigation in Nashville on Friday, October 20, 2006.

According to Inspector Martin, the size of the package was approximately 16" x 25" and it weighed about twenty-five (25) pounds.[1] Inspector Martin placed the parcel in a line up, and a trained narcotics detection dog from the Nashville Metropolitan Police Department was permitted

---

[1] The exact dimensions of the Express Mail package were 18" x 19" x 18". The parcel was addressed to "Umquie, 205 North Patterson, Pulaski, TN. 38478." The California postal inspector informed Inspector Martin that the return address on the package was fictitious. Inspector Martin knew, based on his experience and training, that San Diego, California is a known source city for drug trafficking via U.S. Mail. On October 20, 2006, Inspector Martin contacted the Pulaski post office and learned that 205 North Patterson was a good delivery address. (Docket Entry No. 16.)

1

to sniff the packages. The dog alerted positively on the parcel addressed to 205 North Patterson Street. Inspector Martin obtained a federal search warrant for the package on October 20 and opened the package the same day pursuant to the search warrant. Inside the parcel he found a cedar box within which was a cardboard box. Inside the cardboard box he found six kilograms of a substance that field-tested positive for cocaine.

The package was due to be delivered on Saturday, October 21, 2006. Inspector Martin tried to gather enough agents to conduct a controlled delivery of the parcel to the intended address on Saturday, but he was unsuccessful in doing so. Inspector Martin then contacted the post office that delivers mail to the area of the intended address and learned that the normal delivery time for mail at 205 North Patterson Street was between 9:00 and 10:30 in the morning. Inspector Martin also determined that 205 North Patterson is the location of "Unique Auto," a car detailing business registered to William Smith. Inspector Martin did not uncover any evidence to link the name Brad Yarbrough to Unique Auto or to the utility accounts for the business.

On Saturday morning, October 21, Inspector Martin arrived in Pulaski. He instructed the postal service not to deliver any mail on Patterson Street. Between 9:00 and 10:00 a.m., Inspector Martin conducted surveillance alone at 205 North Patterson Street. He could not tell if Unique Auto was open for business. There was no foot traffic in or out of the building while he watched.

Inspector Martin observed a gold Cadillac parked between 205 North Patterson Street, and Club Faces, which is a separate adjacent structure located at the corner of North Patterson and Jefferson Street. (Def. Exs. 1-3.) The front of the Cadillac faced toward Unique Auto. (Def.'s Ex. 5.) The car was running and an African American male sat in the driver's seat. The driver looked around and held a cell phone to his ear on several occasions. Inspector Martin did not know who the driver was at that time.[2] The Cadillac had an Alabama license plate. Inspector Martin ran a

---

[2] Inspector Martin later identified the driver as Defendant Brad Yarbrough and pointed him out in the courtroom during the suppression hearing. Before October 19, 2006, Inspector Martin was not involved in any prior criminal investigation relating to Brad Yarbrough, Unique Auto or Club Faces.

2

license tag check and learned the car was registered to James Yarbrough. Inspector Martin testified that he did not observe any criminal activity during his surveillance, and the driver's behavior was consistent with innocent conduct as well as waiting for the delivery of the package intended for 205 North Patterson.

Inspector Martin returned to the Pulaski post office and contacted the carrier who normally delivers mail in the area of 205 North Patterson Street. The carrier indicated he did not have any mail for 205 North Patterson that day, so Inspector Martin instructed the carrier to deliver a piece of business bulk mail to the address and to meet with Inspector Martin at the post office after he conducted his mail deliveries on that street. Inspector Martin did not see the carrier deliver the bulk mail to 205 North Patterson. During the subsequent meeting with the mail carrier, Inspector Martin learned that, as the mail carrier approached 205 North Patterson Street, he observed a black male on foot in the area and he also observed a black male in a gold Cadillac. As the mail carrier dismounted the postal vehicle and approached the mailbox located at the door of 205 North Patterson, the black male got out of the Cadillac and commented to the mail carrier about the weather. The mail carrier placed the bulk mail item in the mailbox and left the area. As the mail carrier drove away, he looked in the side mirrors of the vehicle and watched both black males approach the structure at 205 North Patterson.

On Monday morning, October 23, 2006, Inspector Martin prepared for a controlled delivery of the parcel to 205 North Patterson during ordinary mail delivery time. He arrived in Pulaski by 8:30 a.m. to set up surveillance. He was assisted by four Drug Enforcement Agents ("DEA agents"), two postal inspectors and two uniformed Pulaski police officers. Inspector Martin told the officers assisting him that the parcel originated in San Diego and contained six kilograms of cocaine. Inspector Martin positioned himself so that he could observe Unique Auto and Club Faces. The uniformed officers guarded a perimeter around Unique Auto and Club Faces so that no one could arrive or leave. The evidence does not reveal where the other officers positioned themselves.

During surveillance the same gold Cadillac with the same license tag Inspector Martin had observed on Saturday arrived at the club. The driver parked the Cadillac close to the club facing toward Unique Auto. (Def. Ex. 4.) The same black male Inspector Martin had seen driving the Cadillac on Saturday stepped out of the car and went into the club. A couple of minutes later, Inspector Martin saw another car park in the area of the club, and he watched as another black male walked from that vehicle and entered the club. Inspector Martin did not know the identity of the second black male.[3]

Surveillance continued for several more minutes. Inspector Martin did not see any other people in the area, so he decided to direct the undercover postal inspector, who was posing as a mail carrier, to deliver the parcel to Unique Auto. Inspector Martin instructed the undercover postal inspector to pass by the club in the postal vehicle first to see if doing so would create any movement. When the postal vehicle passed the club, Inspector Martin noticed that the front door of the club opened slightly just for a moment and then it closed.

The undercover postal inspector circled the block, parked the postal vehicle at 205 North Patterson, and entered Unique Auto to deliver the parcel. He remained in the business a brief moment and then returned to his postal vehicle and left. He contacted Inspector Martin and told him that when he entered Unique Auto, there was a black male inside the business who advised that he was there to sign for the parcel. The individual signed the delivery confirmation slip for the parcel as "Kevin Johnson."[4] The postal inspector reported that he had placed the parcel in the middle of the floor of the business. The undercover inspector did not see anyone else inside Unique Auto.

Less than a minute after the parcel was delivered, Inspector Martin saw the black male later identified as Gentry leave Unique Auto and walk directly to the club. Gentry was in the club about two minutes when he returned to Unique Auto accompanied by the driver of the gold Cadillac, who

---

[3]The individual was later identified as Cory Perry.

[4]Inspector Martin later identified this individual as David Gentry.

4

was later identified as Brad Yarbrough. Together the two males entered Unique Auto and stayed in the business less than five minutes. While they were in the building, a white SUV driven by an older white female pulled up in front of Unique Auto. An older white male got out of the SUV, went inside Unique Auto for less than a minute and then returned to the SUV, which drove off.[5] After the SUV left, Gentry and Yarbrough stepped out of Unique Auto. Gentry appeared for just a second and then returned to Unique Auto. Yarbrough had a cell phone to his ear. Inspector Martin observed that Yarbrough's mouth was moving and Yarbrough walked back toward the club. Yarbrough walked past the club to the corner of Jefferson and Patterson, where he peered right and then left down Jefferson, before he turned to enter the club.

At that point, sometime between 9:30 and 10:00 a.m., Inspector Martin gave the order to the officers to detain all of the individuals involved. He did not have arrest warrants for any of them. He communicated by radio that certain officers should try to locate the white SUV that had been seen at Unique Auto and detain the white male to be brought back to the scene for questioning about why he went into the business. Inspector Martin did not attempt to obtain a search warrant for Unique Auto or Club Faces. Inspector Martin did not have any evidence to show that Yarbrough was the intended recipient of the package or that Yarbrough had touched the package.

Inspector Martin, along with two other officers, entered Unique Auto. Simultaneously, a postal inspector and a DEA agent detained Yarbrough as he entered Club Faces. All of the officers, including Inspector Martin, were wearing raid jackets.

Once inside Unique Auto, Inspector Martin and the officers identified themselves as police and ordered Gentry to get on the ground. Inspector Martin observed the parcel sitting almost against the wall beside the entry door of the business. It was not open. The black male was handcuffed and the officers stood him up. Inspector Martin read him the Miranda rights from a wallet card. The suspect revealed that he was not "Kevin Johnson" but David Gentry. Inspector Martin asked Gentry

---

[5]Inspector Martin later identified this individual as Daniel Webb.

5

Case 1:06-cr-00012    Document 59    Filed 03/12/07    Page 5 of 13 PageID #: 141

what he was doing at Unique Auto and he responded that Yarbrough had dropped him off there that morning and told him to sign for a parcel that would come in the mail. Inspector Martin asked Gentry if he had ever done that before and Gentry stated Yarbrough solicited him to sign for a previous package. Gentry stated the package that had just been delivered to Unique Auto contained cocaine, but he did not know exactly how much was in the parcel. This questioning took about two minutes. Inspector Martin did not communicate this information to the officers who already had been directed to detain Yarbrough at Club Faces.

Inspector Martin then left Unique Auto and walked the half-block to the club to assist the officers there. When Inspector Martin entered the club, the two agents had their guns drawn on Yarbrough and Perry, who were lying face down on the floor but who were not handcuffed. The men were then handcuffed, stood up, and patted down, but no weapons were found. They were placed on chairs in what appeared to be the vestibule of the club. Inspector Martin read the Miranda rights to Yarbrough, who did not make a statement. A DEA agent read the Miranda rights to Perry and questioned him at the club. The handcuffs remained on Yarbrough for about twenty minutes until the uniformed Pulaski police officers put their own handcuffs on Yarbrough and transported him to the police department.

While Inspector Martin was in the club, agents contacted him to report that they had located a white Explorer observed earlier at Unique Auto, as well as the white male who had entered Unique Auto, Daniel Webb. When interviewed by Inspector Martin, Webb stated that Yarbrough had contacted him that morning to open up Unique Auto because Yarbrough and others were going to detail some cars.

The Government presented only the testimony of Inspector Martin. Defendant Yarbrough did not testify or present any witnesses.

6

## II. CONCLUSIONS OF LAW

Defendant Yarbrough contends that he was illegally arrested without probable cause on October 23, 2006, and therefore, the Court should suppress any evidence seized or developed as a result of his illegal arrest and search incident to arrest. Specifically, Defendant seeks to suppress a receipt to a cell phone bill found in his wallet when he was searched incident to arrest. Through this receipt, the Government identified Yarbrough's cell phone as one from which a call was placed to check on the status of the parcel. (Docket Entry No. 47, Defendant's Memorandum at 3.) The Government defends Defendant's seizure as a legal detention for further investigation under Terry v. Ohio, 392 U.S. 1 (1968), or alternatively, as a warrantless arrest supported by probable cause.

Any suggestion that Defendant Yarbrough's initial seizure was merely a Terry stop to permit further investigation is summarily rejected. See Florida v. Royer, 460 U.S. 491, 500 (1983) (noting investigative detention must be temporary and last no longer than necessary to effectuate purpose of stop); United States v. Bueno, 21 F.3d 120, 125 (6th Cir. 1994) (to demonstrate reasonable Terry stop, Government must show police used least intrusive investigative means reasonably available to dispel suspicion in short period of time). The Government did not present the testimony of the officers who seized Defendant Yarbrough, and Inspector Martin could not shed any light on what occurred at Club Faces because he was not there when Defendant was seized. By the time Inspector Martin arrived at Club Faces, Defendant Yarbrough and Cory Perry were lying face down on the floor inside the building, and the officers were standing over them with their weapons drawn. The uniformed Pulaski police officers had blocked ingress and egress to the area around Club Faces. As soon as Inspector Martin arrived, Defendant was handcuffed and Mirandized, and within twenty minutes the uniformed officers replaced Defendant's handcuffs and took him from the scene. No reasonable person would have believed that he was free to leave. See United States v. Mendenhall, 446 U.S. 544, 553-554 (1980). Thus, the Court has no difficulty in concluding that the detaining officers' actions were tantamount to a *de facto* arrest because the seizure had all of the attributes of a formal arrest without a warrant. See California v. Beheler, 463 U.S. 1121, 1125 (1983); United

7

States v. Vite-Espinoza, 342 F.3d 462, 473-474 (6th Cir. 2003) (and cases cited therein). The only question remaining is whether Defendant's arrest was supported by probable cause.[6]

"Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). "Probable cause exists where "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Whether probable cause exists is a "commonsense, practical question" to be judged from the "totality-of-the-circumstances." Id. at 230. "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Gates, 462 U.S. at 244 n.13; United States v. Schaafsma, 318 F.3d 718, 722 (7th Cir. 2003) ("Although mere suspicion is not enough, probable cause 'need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false.'"). Often, what may appear to be innocent behavior, when taken in light of all the circumstances, may form the grounds for probable cause. See Wright, 16 F.3d at 143; United States v. Anderson, 923 F.2d 450, 456 (6th Cir. 1991). And, as Defendant concedes, "'the Fourth Amendment permits a duly authorized law enforcement officer to make a warrantless arrest in a public place even though he had adequate opportunity to procure a warrant after developing probable cause for arrest.'" United States v. Wright, 16 F.3d 1429, 1438 (6th Cir. 1994) (quoted cases omitted).

The Court must consider the totality of the circumstances as they were known to Inspector Martin and give them a commonsense interpretation as a reasonable person would have done at the time. See Anderson, 923 F.2d at 456 ("The test for the existence of probable cause is wholly objective. Probable cause exists when a 'man of reasonable caution' . . . would be warranted in the belief that the person arrested had or will commit a crime."); Schaafsma, 318 F.3d at 722 ( "A

---

[6]Defendant Yarbrough does not raise any claim that the officers entered Club Faces and Unique Auto without an anticipatory search warrant in violation of his Fourth Amendment rights. See United States v. Grubbs, — U.S. —, 126 S.Ct. 1494 (2006); United States v. Robinson, 390 F.3d 853 (6th Cir. 2004).

8

police officer has probable cause to make an arrest 'when the facts within the officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a prudent person in believing the suspect has committed or is committing an offense.'"). The Court concludes that Defendant Yarbrough's warrantless arrest was supported by probable cause.

Inspector Martin knew that the package originated in San Diego, California, a source city for drug trafficking through the U.S. Mail. He knew that the return address on the package was fictitious, but that Unique Auto at 205 North Patterson Street in Pulaski, Tennessee, was a good delivery address. Although he did not link Defendant to Unique Auto through its business registration or utility accounts, Inspector Martin conducted surveillance of the intended delivery location on Saturday, October 21, 2006, when the package was due to be delivered. He watched as Defendant waited in the gold Cadillac, looked around, and talked on his cell phone during the time when mail normally is delivered in the area. When a mail carrier delivered a piece of bulk mail to Unique Auto, Defendant got out of the Cadillac and spoke to the mail carrier. While Defendant's comment on the weather was consistent with innocent conduct, his comment was also consistent with an attempt to engage the mail carrier in conversation that might lead to information concerning the package. As the mail carrier drove away, Defendant and another black male approached Unique Auto.

On Monday morning, October 23, 2006, Defendant again arrived in the gold Cadillac during the time of normal mail delivery in the area. He parked near the club and went inside. A short while later, Perry arrived, parked, and went inside. When the postal vehicle drove by, the front door of the club opened slightly and closed, showing interest in the whereabouts of the postal vehicle. Within two minutes after delivery of the parcel to Gentry at Unique Auto, Gentry walked to the club. Again within minutes, Gentry returned to Unique Auto in the company of Defendant. The two of them went inside Unique Auto and stayed approximately five minutes. A white SUV arrived and a white male went inside for a short period of time. One or more of these men actually touched the package because it was later found unopened by the wall near the entry door even though the

9

undercover postal inspector left the parcel in the middle of the floor upon delivery. The white male left the premises. Gentry appeared outside of Unique Auto for just a moment, but then he ducked back inside. Defendant left Unique Auto while talking on his cell phone, walked to the corner near the club, and peered both ways down Jefferson Street before he returned to the entry door of the club, where he was arrested. Cf. United States v. Bartholomew, 310 F.3d 912, 918-919 (6th Cir. 2002) (upholding denial of motion to suppress where co-conspirator, after receiving controlled delivery of marijuana shipment, left the house and strolled the neighborhood to determine whether he was under surveillance, and then got into vehicle that drove by carrying defendant as a passenger).

All of Defendant's conduct, when viewed in its totality, would give a prudent person reason to believe that a drug trafficking crime had been or was being committed. See United States v. Springfield, 196 F.3d 1180, 1183 (10th Cir. 1999). All of the information just summarized was available to Inspector Martin before he directed Defendant's detention.[7] Thus, Inspector Martin had sufficient probable cause to arrest the Defendant on a suspected drug offense. See United States v. Hernandez, 322 F.3d 592, 597 (9th Cir. 2003) (holding defendant's presence in rear seat of minivan in conjunction with his suspicious behavior and proximity to commercial quantity of illegal drugs gave border agents probable cause to arrest him). Incident to that arrest, officers had authority to search Defendant's person, which turned up the cell phone receipt and possibly other incriminating evidence. See Wright, 16 F.3d at 1438 (holding officers had authority to search defendant's person incident to arrest).

Defendant relies on United States v. Hughes, 898 F.2d 63 (6th Cir. 1990), but that case is not a close fit with this case. In Hughes, detectives passed through a high crime area where drug trafficking often took place and observed what they believed was a drug transaction occurring in the

---

[7]While Inspector Martin learned more information about Defendant Yarbrough's involvement when Gentry stated during his detention that Yarbrough solicited him to wait at Unique Auto to sign for the package, this information did not play a part in Inspector Martin's decision to order Yarbrough's detention because he had already done so.

10

middle of the street. Id. at 64. In evaluating whether the police had probable cause to arrest, the Sixth Circuit adopted four factors taken from United States v. Green, 670 F.2d 1148, 1151-1152 (D.C. Cir. 1981) "in determining whether the 'totality of the circumstances' provides probable cause in a drug case: 1) the presence of a suspect in a neighborhood notorious for drug trafficking; 2) suspects engaging in a sequence of events typical of a drug transaction; 3) a suspect's flight after being confronted by the police; and 4) a suspect's attempt to conceal the subject of his activities." Defendant contends that, because Unique Auto was not located in a neighborhood notorious for drug trafficking, his conduct was innocent and not suspicious, and he did not attempt to flee or conceal his activities, Inspector Martin lacked probable cause to order Defendant's arrest.

It is understandable that the Sixth Circuit adopted the Green factors in Hughes because the factors were useful in analyzing the two factually-similar cases. The Sixth Circuit did not state in Hughes that the Green factors must be applied in all drug cases; rather, the court stated only "[w]e think that the Green factors provide a helpful framework in analyzing probable cause determinations in the drug trafficking area and therefore adopt these factors here." Hughes, 898 F.2d at 64.

Even applying the Green factors, the Court concludes that Inspector Martin had probable cause to arrest Defendant. No evidence was provided that Unique Auto and Club Faces were located in a neighborhood notorious for drug trafficking. There was no flight from police. But as already explained, Defendant engaged in a sequence of events typical of a drug transaction in that he waited for and received a mail package containing cocaine. Moreover, Defendant attempted to conceal the subject of his activities. He did not wait in Unique Auto for delivery of the package; instead he had Gentry wait for the package and sign the delivery confirmation slip for it. Defendant and Perry waited in Club Faces, and Inspector Martin saw the door of Club Faces open slightly and close again when the postal vehicle drove by on Monday, the day of the controlled delivery. After the package was delivered to Unique Auto, Defendant went into Unique Auto with Gentry and then walked to the corner and peered up and down the street in an apparent effort to determine whether he was

11

under surveillance. All of this conduct indicates Defendant wished to hide his involvement in the package delivery. Even under the Green factors, Inspector Martin had probable cause for arrest.

Defendant's reliance on United States v. Caicedo, 85 F.3d 1184 (6th Cir. 1996) is also misplaced. There an officer assigned to drug interdiction at a bus station watched as a passenger carrying a backpack got off a bus quickly. The officer did not know where the bus had come from. Upon seeing the officer, the passenger "jerked," appeared "startled," and broke eye contact. The passenger walked briskly past the officer toward the terminal front entrance clenching his hands around the backpack shoulder straps. The passenger was shaking and looked back over his shoulder numerous times. The officer followed and saw the passenger get into a waiting car. Upon seeing the officer, the driver's eyes widened, his jaw dropped, and he put the car in motion before the passenger had fully seated himself. The officer leaned in the driver's window and asked to speak to the pair, and they agreed. Without prompting, the passenger got out of the car and left the backpack in the seat. He admitted to the officer that the backpack was his and consented to its search. Cocaine was found in the backpack. Id. at 1187-1188. In justifying seizure of the passenger, the officer relied primarily on the defendants' nervous reactions to his presence. The Sixth Circuit determined that the officer lacked a reasonable particularized suspicion to stop the passenger and therefore, the district court should have suppressed the evidence as against him, even though the court did not require suppression of the contraband as against the driver. Id. at 1188-1190.

In this case, as set forth above, Inspector Martin possessed far more relevant information than did the officer at the bus terminal in Caicedo. Inspector Martin knew the package had come from a source city, that the package contained six kilograms of cocaine, and that Defendant waited for delivery of the package on both Saturday and Monday. Defendant's actions upon the controlled delivery of the parcel confirmed his involvement with the package and gave Inspector Martin probable cause to effectuate the arrest.

12

## III. CONCLUSION

For all of the reasons stated, Defendant's Motion to Suppress (Docket Entry No. 47), will be denied.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

13